Compensation Appeals Board
No. 2000-779

APPEAL OF CNA INSURANCE COMPANY
(New Hampshire Compensation Appeals Board)

Argued: June 19, 2002
Opinion Issued: September 17, 2002

*Sulloway & Hollis, P.L.L.C.*, of Concord (*James E. Owers* and *Derek D. Lick* on the brief, and *Mr. Owers* orally), for the petitioner.

*Patch & Fitzgerald, P.A.*, of Manchester (*Edward F. Patch* on the brief and orally), for the respondent.

*Shanelaris & Schirch, P.L.L.C.*, of Nashua (*Catherine E. Shanelaris* and *Jane M. Schirch* on the brief) for the claimant.

DALIANIS, J. The petitioner, CNA Insurance Company (CNA), appeals a decision of the New Hampshire Compensation Appeals Board (board). The board held that CNA, rather than the respondent, Acadia Insurance Company (Acadia), was liable for the claimant's, Charmaine Pescinski's, disability benefits. We vacate and remand.

The following facts were either found by the board or are contained in the record. The claimant worked for Delta Dental Plan of New Hampshire as a customer service representative. Prior to joining Delta Dental, she had worked in various jobs and received two years of college education, studying to be a medical assistant. Her job duties at Delta Dental included, among other things, answering as many as 100 telephone calls each day, using a computer and taking written notes. On or about November 19, 1997, the claimant began experiencing pain and swelling in her right hand and reported her symptoms to her supervisor. On December 9, 1997, she was diagnosed with atypical carpal tunnel syndrome. The record does not contain a definition of atypical carpal tunnel syndrome.

Although the claimant was not placed on medical work restriction, Delta Dental modified her job requirements on a temporary basis. These modifications alleviated her symptoms somewhat but did not result in a complete abatement of her condition. In March 1998, the claimant reported an exacerbation in her condition due to typing and writing, complaining that the pain in her hand became progressively worse during the week. Her physician opined that her condition would not improve unless her workstation were ergonomically improved, her work hours were reduced or she were moved to a different job.

On December 1, 1998, Delta Dental changed workers' compensation carriers from CNA to Acadia. The claimant did not seek medical treatment for her condition again until April 1999, when her symptoms recurred, causing pain in both her right and left wrists and forearms. In June 1999, the claimant began missing work periodically and eventually she underwent surgery in April 2000. The claimant received increases in pay after the onset of her atypical carpal tunnel syndrome.

On January 28, 2000, the New Hampshire Department of Labor (DOL) hearing officer ruled that Acadia was liable for the claimant's benefits. The hearing officer found that the claimant sustained a cumulative trauma injury, which became disabling on June 25, 1999, when she first missed time from work. On appeal, there was no dispute before the board that the claimant's atypical carpal tunnel syndrome was causally related to her employment at Delta Dental. The only issue before the board was the determination of the date of injury and, therefore, the responsible carrier. The board reversed the DOL decision, holding that CNA was the responsible carrier because "the claimant suffered a disabling injury which was manifested in November of 1997 when CNA was the employer defendant's insurer." It ruled that the claimant experienced a loss in earning capacity in November and December 1997. Following CNA's motion for rehearing, the board reaffirmed its decision.

"We will not disturb the board's decision absent an error of law, or unless, by a clear preponderance of the evidence, we find it to be unjust or unreasonable." *Appeal of Bergeron*, 144 N.H. 681, 683 (2000); *see* RSA 541:13 (1997). We consider the board's findings of fact to be *prima facie* lawful and reasonable. *See* RSA 541:13.

CNA argues that the board erred by finding, without the assistance of expert testimony, that the claimant suffered a diminished earning capacity in November 1997. Acadia argues, however, that it is not necessary to consider diminished earning capacity because the claimant did not sustain a cumulative trauma injury. It argues instead that the board properly determined that the claimant suffered a discrete compensable injury on November 17, 1997, that remained unstable and debilitative thereafter,

making CNA the responsible carrier. Alternatively, Acadia asserts that the board did not err in finding, without the aid of expert testimony, that the claimant experienced a diminished earning capacity in November 1997.

The nature of the claimant's injury is the threshold issue in this case. If she sustained a discrete injury in November 1997, which remained unstable and debilitative thereafter, then the date of her injury would "relate back" to the November 1997 injury, rendering CNA the responsible carrier. *See Appeal of Newton*, 146 N.H. 186, 189 (2001). If, however, the claimant sustained a cumulative trauma injury, then the date of her injury would be when she sustained a diminished earning capacity. *Appeal of Wausau Ins. Cos.*, 143 N.H. 478, 480 (1999). Unlike discrete injuries, cumulative traumas are not compensable until the date the disability arises, *see Appeal of Briggs*, 138 N.H. 623, 631 (1994), because it is not possible to identify a single event, occurring at a particular date and time, that caused the injury. *See King v. DC Dept. of Employment Services*, 742 A.2d 460, 468-69 (D.C. 1999).

We disagree that the board treated the claimant's injury as a discrete injury. In its decision, the board describes the claimant's case as a cumulative trauma case and cites her diminished earning capacity as determinative of measuring her date of injury. While the board does state that the injury resulted from a sudden onset of symptoms, we do not construe its decision as finding her injury to be anything other than a cumulative trauma injury. Even assuming, however, that the board found the claimant's injury to be a discrete injury, that decision is not supported by the evidence and is legally erroneous.

Carpal tunnel syndrome is generally classified as a cumulative trauma disorder resulting from repetitive motion. *See Duvall v. ICI Americas, Inc.*, 621 N.E.2d 1122, 1125-26 (Ind. Ct. App. 1993); *see also* McCluskey, *The Illusion of Efficiency in Workers' Compensation "Reform,"* 50 RUTGERS L. REV. 657, 776-77 (1998). Nevertheless, under certain circumstances, carpal tunnel syndrome can be caused by a single traumatic event. *See Ogden Aviation Services v. Saghy*, 526 S.E.2d 756, 762-63 (Va. Ct. App. 2000) (claimant's carpal tunnel syndrome developed suddenly when he lifted fuel hose); *Bond v. W.C.A.B. (Belmont Center)*, 711 A.2d 554, 557 (Pa. Commw. Ct. 1998) (claimant's carpal tunnel syndrome resulted from single incident in which he was physically abused by patients at psychiatric hospital).

The medical evidence in this case does not support a finding that the claimant's injury was caused by a single identifiable event. Rather, the evidence establishes that the claimant's carpal tunnel syndrome resulted from repetitive motion or overuse of her hands while performing her job functions. As one physician noted, the claimant's carpal tunnel syndrome

was "the result of her work in which she has repetitive use of her hands, typing, writing, and answering phones." In addition, another physician opined that her condition "originally occurred in November 1997 and is causally related to her activity at that time and before that time," and that the condition in her left wrist was related to repetitive motion over several months. While the claimant's treating physician did note that she suffered a sudden onset of symptoms on November 19, 1997, neither he nor any other physician opined that the claimant's condition resulted from a single traumatic event.

■ ■ While cumulative trauma cases typically involve situations in which the claimant's symptoms gradually increase over time, the fact that an injury appears to arise suddenly does not necessarily mean that the injury is *not* the result of cumulative trauma. *See Appeal of Commercial Union Ins. Co.*, 145 N.H. 356, 357-58 (2000) (symptom of cumulative trauma was sudden onset of sharp pain in shoulder). It is the cause of the claimant's injury, not the resulting symptoms, which determines whether an injury is a discrete injury or the result of cumulative trauma. *See Barker v. Home-Crest Corp.*, 805 S.W.2d 373, 375 (Tenn. 1991). Here, there is no evidence that the claimant's carpal tunnel syndrome was *caused* by a single discrete incident on November 19, 1997. We conclude, therefore, that the claimant sustained a cumulative trauma injury.

We next consider whether the board erred when it ruled that the date of the claimant's injury was in November 1997. CNA argues that the board erred in ruling that the claimant suffered a diminished earning capacity in November and December 1997 because there was no evidence that the claimant was on medical work restriction and no expert testimony was offered to show how the onset of her symptoms resulted in lost earning capacity.

■ "[T]he appropriate date of the injury in a claim for workers' compensation involving cumulative trauma is the day the claimant's injury causes a diminished earning capacity." *Wausau*, 143 N.H. at 481.

> Earning capacity is an objective measure of a worker's ability to earn wages. As such, a determination of whether a worker's earning capacity has been diminished must be reached with reference to the worker's value in the marketplace, independent of the subjective measure of the worker's actual earnings.

*Appeal of Commercial Union Ins. Co.*, 145 N.H. at 358 (quotations omitted). The test used to determine entitlement to compensation is "whether the claimant is now able to earn, in suitable work under normal

employment conditions, as much as he or she earned at the time of the injury." *Appeal of Normand*, 137 N.H. 617, 621 (1993) (quotations omitted).

In its decision, the board stated that the claimant began to suffer a diminution in earning capacity in November and December 1997 when she began to experience symptoms of carpal tunnel syndrome. It found that from the date of onset, the claimant was unable to perform her regular job duties without limitation, and that by March 23, 1998, she could not continue to perform her full-time duties without continuing to worsen her condition or reduce her earning capacity. The board explained that "after the initial onset of the claimant's symptoms she was able to continue to maintain her previously established earning capacity because of her employer's voluntary indulgence in her need for accommodation without which accommodation she would have suffered a diminution in her earning capacity."

■ CNA argues that because the claimant continued to work without medical restrictions while earning increased wages, Delta Dental's modifications of her job duties is irrelevant and does not support the board's decision that she suffered a loss in earning capacity. We disagree. While earning capacity is to be judged independently from the subjective measure of actual earnings, *Appeal of Commercial Union Ins. Co.*, 145 N.H. at 358, and while there is a general presumption that a claimant has not sustained a loss of earning capacity when she returns to work and her post-injury earnings equal or exceed earnings at the time of the injury, 4 A. LARSON & L. LARSON, LARSON'S WORKERS' COMPENSATION LAW § 81.01[4] (2000), this presumption "may be rebutted by evidence independently showing incapacity or explaining away the post-injury earnings as an unreliable basis for estimating capacity." *Id.* One example of a situation in which post-injury earnings will be treated as unreliable is where the work for which the claimant is paid is "made work" or "sheltered work." *Id.* § 81.06; *see also Alsbrooks v. Industrial Com'n*, 616 P.2d 929, 931 (Ariz. Ct. App. 1980) (presumption that post-injury earnings establish earning capacity can be rebutted by evidence that job secured by worker is created by employer solely out of sympathy).

The claimant testified before the board that, since the onset of her carpal tunnel syndrome, she could not perform her regular job functions without experiencing symptoms. Further, the fact that the claimant's modified job duties were available on a temporary basis could support a finding that Delta Dental gave the claimant sheltered work to accommodate her. Thus, there is evidence that could support a finding that

the claimant suffered a diminished earning capacity as early as November and December 1997 despite her continued employment at Delta Dental.

█ █ The relevant inquiry into whether a worker suffers a loss in earning capacity, however, is not limited to her ability to perform the type of work she was engaged in at the time of her injury, but rather must include a consideration of that worker's overall value in the marketplace. *See Appeal of Commercial Union Ins. Co.*, 145 N.H. at 358; *see also Corcoran v. Foster Auto GMC, Inc.*, 746 S.W.2d 452, 458 (Tenn. 1988). Here, the board made no findings as to the claimant's overall value in the marketplace, taking into account such variables as her age, education and job training. It did not determine whether she had the ability to "earn, in suitable work under normal employment conditions, as much as . . . she earned at the time of the injury[,]" *Appeal of Normand*, 137 N.H. at 621, but instead focused solely upon her ability to perform her duties as a customer service representative at Delta Dental. For this reason, we must remand this case to the board for further findings of fact to ascertain whether the claimant experienced a loss in earning capacity in November 1997.

CNA argues, however, that under the circumstances of this case, the board cannot decide whether the claimant experienced a loss in earning capacity in November 1997 without the testimony of a vocational or employment expert. In the workers' compensation context, we have held that the issue of medical causation is a matter properly left for medical experts, and that the board's findings on that issue must be based upon the medical evidence rather than solely upon its own lay opinion. *Appeal of Kehoe*, 141 N.H. 412, 417 (1996). While the issue presently before us is a novel one, other jurisdictions have held that a board does not have to rely upon the opinion of a vocational or employment expert when assessing a worker's diminished earning capacity. *See, e.g., State Ex. Rel. Jackson v. Indus. Comm.*, 680 N.E.2d 1233, 1236-37 (Ohio 1997); *Twenty-First Cent. Concrete v. Giacchina*, 457 S.E.2d 379, 381 (Va. Ct. App. 1995); *Haney v. Aaron Ferer & Sons, Co.*, 521 N.W.2d 77, 83 (Neb. Ct. App. 1994); *Bituminous Cas. Co. v. Dept. of Industry*, 295 N.W.2d 183, 187-88 (Wis. Ct. App. 1980) (employment expert not required in order for claimant to make *prima facie* showing of lost earning capacity).

In *Haney*, for example, a worker with a high school education and no special job training sustained a back injury on June 5, 1991, while working as a laborer. *Haney*, 521 N.W.2d at 79. After reaching maximum medical improvement, the worker was allowed to perform light duty work, but was medically restricted from lifting anything over twenty pounds and from engaging in certain movements such as twisting. *Id.* On appeal, the

employer argued that the court erred when it made a finding of lost earning capacity without the testimony of a vocational expert. *Id.* at 81. The Court of Appeals of Nebraska disagreed, stating that loss of earning power is a question of fact, and that the court did not need expert testimony to decide loss of earning capacity when the record showed clearly that the worker: 1) was placed on work restrictions; 2) had been diagnosed with various impairment ratings; and 3) had a high school education and his work experience was limited to manual labor positions. *Id.* at 83.

We find *Haney*, as well as cases from other jurisdictions, to be instructive, and agree that the board generally does not need to rely upon expert testimony when deciding questions of diminished earning capacity. Unlike issues involving medical causation, the determination of whether a claimant's disability has caused a diminished earning capacity can be based upon non-expert testimony, including the testimony of the claimant. *See Haney*, 521 N.W.2d at 81; *Corcoran v. Foster Auto GMC, Inc.*, 746 S.W.2d at 458. Nonetheless, there may be instances where expert testimony is necessary to support a decision regarding a worker's earning capacity. Unlike the situation in *Haney*, there may be times when, due to a claimant's job skills and education, the determination as to whether he or she can compete in the open labor market is beyond the ken of the CAB. Thus, in some circumstances lay testimony may be insufficient to support the board's findings. We disagree with CNA, however, that expert testimony is needed simply because a worker continues to work without medical restrictions following an injury.

Because the board did not address whether the claimant can compete in the open labor market, we do not decide in the first instance whether a vocational or employment expert is necessary in this case. Accordingly, we vacate the board's decision and remand for further proceedings consistent with this opinion.

*Vacated and remanded.*

BROCK, C.J., and NADEAU and DUGGAN, JJ., concurred.